So, um, yeah, again, I would recommend the whole class here mainly because it's our    Um, so having the senior students as number one on the shout team is really really helpful to come up with recommendations for number three on this item. In this case it is number 071016, all computers against Intel, published history of evolution. I'm not going to scratch anything with this, I'll put it on the floor. May it please the court, if I may ask the court's indulgence before we get into the questions, I'm sure you have a lot of them. I want to mention something briefly that was not specifically mentioned in our papers. It relates to the sanctions. And I just wanted to point out that the sanctions were recluded from basically supplementing our expert report to identify other products. We comply fully with rule 26E and 26A3, which allows us to supplement expert reports up to 30 days before trial. Thought that had even been set at the time the sanctions were entered. So we didn't specifically reference 26E1 and 26A3 in our papers. But I wanted to specifically, as the court's mentioned. I'll go ahead and start, but I mean, you can interrupt me if you always do. The claim says Borg. It says it multiple times. Is this a Borg? Sure. And we lodged with the court, and I hope you had an opportunity to see and review one. There's a Borg, there's no question about that. And there was never a dispute on our side that the microprocessor is mounted on a Borg. This is a Celeron. I think the court concluded that the Celeron is just a microprocessor, a little microprocessor chip which fits directly into the motherboard. That's the only thing I could sense I could make a decision. That is not what Celeron is. Celeron has a physical printed circuit board on which the microprocessor is mounted. You're not arguing claim construction so much as you're arguing infringement. You're saying you are a Borg. Absolutely. That's undisputable. That's undisputable. So that's a discussion which really is irrelevant in this time. The part of the reason I was confused on that was we had taken a position that the Borg should be loaded into the circuitry. They were arguing that it's that the clock circuit had been mounted. And the court basically took an immediate position and said, no, it's the microprocessor that has to be mounted, and that is the fact. And I don't think that the incumbent disputed that. So we get past that claim limitation, and then we get to the others. First of all, I wanna talk about the question of whether there was actual evidence of infringement. And there is, we didn't produce a person that said I went to the store and bought a cell phone and replaced it. But we did introduce the evidence, uncontroverted, that Intel specifications require for the operation a clock circuit chip. And the clock circuit, without it, it won't function. So unless people are buying these paperweights, they have to follow these instructions. They have to merge a chip with a clock. The only clock identified in Intel's information it gives to manufacturers and consumers is a particular clock chip, the ICS clock chip, which we identified in our expert, took the circuitry apart, analyzed it, said it meets the limitation of the subharmonic generator that produces a subharmonic signal, and that subharmonic signal is in sync with the signal that goes into the PLL on the cell phone, and that PLL signal is then fed into the microprocessor. This case was really simple and straightforward, and I think it got, I think, confused in the minds of the court, particularly about this issue of Intel referring to the cell phone as a microprocessor when it isn't. It's a product that has a microprocessor. It's a whole board issue. On the known phase relationship issue, again, we had experts on every one of those things. They had nothing but lawyer arguments. Our expert said correctly that the ICS clock chip produces a signal, which is in a known phase relationship with the original input signal, the first clock signal, and with the signal that emanates from the PLL. There's no argument about the PLL, because that's what a PLL does. It's a phase-locked loop oscillator, and it's a way of stepping up the frequency of the signal and ensuring that the output signal is in phase with the input signal. That's the definition of that product, and they don't dispute it. I think everybody agrees with that definition. Correct. Yes, they do. So the only issue then is the subharmonic generator. The essence of this invention, and Intel actually did a much better job than I did in their brief in describing the invention and what the problem was intended to solve. Prior to the invention, and prior to today's technology, they used to use different crystal oscillators to create one clock signal for the microprocessor and another clock signal to run the rest of the computer. And that was a problem, because when you're at the keyboard and you're typing a signal, and that signal is not in sync with the signal that goes to the microprocessor, you have delays. And the whole idea of, when Intel's been trying to do forever, is to speed up the process. So if they're not in sync, you slow the process down. So what the invention does, and what it has done in all of these products, is that it takes the original input signal, which is this first clock signal, splits it, splits it in the ICS clock chip. Through a subharmonic generator, one signal is dedicated to the processor. The other signal continues on down and runs the IO port and the DRAM and the cache and everything else that's in the computer. So these two signals, because they come from the same source, and they're split by a subharmonic generator, by definition, there is a synchronous relationship between those two signals. And then that's held in place by the PLL and goes to the microprocessor. So the whole thing is in sync. That's the kind of simplicity and the beauty of the invention, and that's precisely what these clock chips do. They're basically like the switching stations for trains. A Celeron's an integrated circuit, a chip. Why do you dismiss it so quickly as being a board? Because it is a board. I meant to show you. No, the showing thing doesn't help me at all. I'm not finding facts here. I'm drawing on what the district court found, which is that a chip is different from a board, and a Celeron is an integrated circuit, a chip. So you're gonna have to help me a little more. Sure, I think what the court found in reading the claim limitation, and I had this conversation with my client all the time, he's speaking to me now. I hate the word chip, because it's not a precise term. The term in the claim is the microprocessor, not a chip. There's no, the word chip's not in the claims. So to the extent the court found a chip or an integrated circuit, it's irrelevant to the claims. The claims talk about an upgraded microprocessor, and it's mounted on a board, and it's going to replace an upgraded microprocessor. A chip is nothing more than a plastic container in which you find most of these things are cemented. It's an outer casing. It has nothing to do with any, it's not a technical term at all. It's a term people, it's a throwaway term, it's a shorthand. It's an accelerator board having an upgraded microprocessor there on. Correct. But it's gotta have the board, right? Yeah, that's what they're on. It's mounted on a board, which is in turn, which has sockets. And then you plug it in. He plugs it in, and our expert testified to that in detail in his expert report, which was part of their summary judgment motion, and in his declaration in opposition to their motion. And the only reason I'm giving you this, and I know you're not going to find it back, but just so you can see, compare that to what he said in both his report and in his opposition declaration. There's no controversy about this. As a matter of fact, an expert is an expert. He knows what the structure of this thing is. He wasn't about to say it's not mounted on a substrate. It clearly is. Everybody knows it is. And it's got- With respect to the clocks, let's go back to very simple aspects of it. This is generated by a clock, right? Correct. On the computer system board for operation of the first microprocessor. Correct. That's right. Now, does that have to be directly on a microprocessor? No. In fact, it doesn't go to the microprocessor at all. That's a ghost microprocessor. It's a first-class signal that- Must be applied to the original microprocessor. Well, it doesn't have to be actually applied to the original microprocessor, because in the spec, there isn't an original microprocessor. It's a signal that would have been applied to the original microprocessor if there was one, and if that signal had not been modified by the separate microgenerator. Is it required to be on the same board? No. And the court didn't find any place to require it to be anywhere? Well, I bet the court did find that. For operation generated by a monoduron, the accelerator board, the printed circuit board, made an insulated material or an upgraded microprocessor, the monoduron is in fact connected to the socket of the computer board system. Correct. So that's connected, too. Oh, yeah. This is connected. The board is connected. There's no question. Well, you asked me whether or not he said the clock had to be on the board, and he did not. There's nothing in there where he said the clock had to be on the board. Correct. Correct. That's under the court's interpretation, and we agree with that. We don't have a problem with that. Under Claim 5, we do disagree, because I think Claim 5 clearly is limited to the circuitry and really doesn't have a limitation upon the fact that it's mounted on anything other than the name. I've never seen a case, and they haven't cited a case, that says the title of the invention in the claim is itself containing the limitation, which is what they argue in terms of the board. They say, for frankly purposes, it doesn't matter. I think it was a bad claim interpretation for the court to look at the word board in the title of the invention and say, now I'm going to make that as a limitation into the invention instead of looking at what came after the word process. Thank you. Mr. Cordell. Thank you, Your Honor. May it please the court, Ruffin Cordell from Fish and Richardson on behalf of Intel Corporation. I'd like to begin by echoing something that Mr. O'Connor said about the context of this invention, because I do think it's very important in this particular case. What this patent purported to address was a problem in the early 1990s when a consumer's computer seemed a little outdated, and yet computers were expensive. And so what all computers proposed was a way for a consumer to upgrade his or her own computer by buying a particular set of components from all computers that were pre-packaged and pre-arranged to ease that task. It was difficult for a consumer to go in and take out his microprocessor and put in a new and faster one. It was difficult for at least two reasons. One, it took skill. You had to have some electronics ability in order to do that. But number two, you had to adjust all of the supporting electronics in order to make that happen. If you just took a faster microprocessor and put it into the socket, which is a receptacle on the motherboard that we see in Figure 1 that shows where the microprocessor is received. If you simply took the old one out of the socket and put in a new one without either replacing or adjusting all of the supporting electronics, you wouldn't be able to take advantage of the faster microprocessor. So what all computers did was to come up with a way to pre-package all of the supporting electronics with a new microprocessor that would fit into the same socket as the old microprocessor. And so the process was simply to remove the old microprocessor and replace it with this new microprocessor and all of the supporting electronics. And in order to do that, in order to have that package put together in a way that a consumer could manipulate, they mounted them on a board. They mounted them on their own circuit board so that it was easier and more... Actually, it enabled it in the first instance. It enabled the consumer's ability to do that. And really, all of the construction issues and all of the infringement issues that we're going to talk about this morning are informed by that context, each and every one of them. So we can begin with the accelerated board. Let me first just comment on Mr. O'Connor's demise. One of the difficulties that he faces, and that we've all faced in this case, is ACI's inability to actually tell us what was at issue. This, and this for the record is I think a single edge connector package, was never accused in this case. ACI was given multiple opportunities to tell us exactly what products were accused and this was never accused. And so it forms no part of the record below and no part of this appeal and therefore really is not particularly of relevance here. Beyond that, when we look at the accelerated board limitation, and just to make the record clear, we did disclose information about that single edge connector package in the case, but ACI chose never to accuse it. So I need to respond to some of the things that they've said in the brief and it wasn't the case where that formed no part of the proceedings below. It was simply never accused in any way by ACI. So let's look at the construction issues themselves. Accelerated board. We start with the claim language. The claim language uses the term board. It doesn't call it a circuit. It doesn't call it a device. It doesn't call it a system. It doesn't call it an apparatus. It uses the term board. ACI was quite happy in its initial claim construction definitions that were proposed in the district court. But is the acceleron something that has all the components, the clock, the phase locked loop, et cetera, so it really is a board? No. And in fact, ACI has never contended that the acceleron itself constitutes the infringing condemnation. The best they could come up with was their October 8 disclosures. These are the ones that were made in response to Judge O'Grady's order that they supplement their infringement contentions and tell us exactly what infringed. October 8 was seven days before the close of discovery. The final pre-trial conference was October 21. So on October 8, we got what Judge Lee called their final answer as to their infringement contentions. And in those infringement contentions, what they pointed to as the accelerator board was not the acceleron. It was not the single edge connected device. In fact, what it was was the ACS clock chip. The ICS clock chip. I'm sorry. The 9250.10 clock chip. And that was on October 8. That's at appendix A328. That was their final answer. They pointed to the clock chip. Not on board at all. Not a chip. Not, well, it was a chip. But it was a different chip. It wasn't the acceleron chip. So one of the things that we could do is we could take ACI's proposed construction. And if this court were to adopt ACI's proposed construction, which, again, I would argue that is inappropriate, but if you did, their proposed construction is simply that I'm just trying to find it here. Their construction is a device that may be used to replace a microprocessor. Your Honors, the ICS clock chip may not be used to replace a microprocessor. Even ACI can't contend that. So even if you were to adopt their claimed construction, you would still have to uphold judgment on the infringement. But of course, the claimed construction the district court reached is correct on the accelerator board. Judge Lee's order was thoroughly thoughtful. He addressed all of the various sources of evidence that we use to garner meaning in claims. He went through the intrinsic record. He looked at the claim lawyers, the fact that they used board, that they were happy to define board as a sheet of insulating material carrying circuit elements and terminals so that it can be inserted in an electronic apparatus. That was the definition that ACI proposed before they discovered that they couldn't prove infringement under their own proposed construction. Judge Lee recognized that. He went through the specification. He saw the various places in the intrinsic record where a board is defined, where it's discussed as carrying various electronic components, and he accepted those. And in the end, he reached the correct construction. Is that really the whole essence of the plot is to increase the speed of the microprocessor? It is. So that you can increase the megahertz of whatever the initial signal is to a higher, faster signal? Correct. That's exactly right. So that's the whole essence of the plot, isn't it? The patent really talks about three different signals. The first clock signal, and Your Honor asked Mr. O'Connor about that, and it is shown directly in Figure 1 that the motherboard, the original motherboard, produces a clock signal because it assumes that it's driving a microprocessor. And so it is shown in Figure 1 as the S clock. It is connected to the socket on the left-hand side of the drawing. You'll see in the lower left-hand corner of Figure 1. That is what Judge Lee found to be the first clock signal. And it is intended to drive a microprocessor. It is shown as coming through the socket that connects the microprocessor to the motherboard. And that's what defined the first clock signal. It is also used to move information around the motherboard. And so that's the first clock signal. The patent talks about two others. There's a sub-harmonic signal that is generated based on that first clock signal, and then a second clock signal that is generated therefrom. That's to make sure that the phase is the same, that the signals are in phase. Correct. All three must be in a known phase relationship. And the court was correct that it was undisputed below the agreed construction that known phase relationship be a zero phase difference or known phase difference. ACI resists that on appeal. And they seem to, while not challenging the construction because it was agreed below, they dispute whether it applies in this case. Because they now understand that the intel system doesn't have these known phase relationships. But your honor, you know, they consented to that construction below. They can't resist it on appeal. And if I can just touch on one other brief issue, which is the court's question about the first clock signal and the district court's construction of that term. It was correct. But most importantly, that clock signal that ACI points to as being the first clock signal never escapes. The clock chip is buried within the circuitry of the clock chip. It cannot be used to drive a microprocessor. It cannot be used to move information about the circuit board because it never gets outside the clock chip. We have a figure at page 36 of the red brief where we actually explain the difference between the clock signal they point to as the first clock signal and the subharmonic. And they have a dolly D even flow problem to the extent that they attempt to merge the two. Those two signals are separately resided in the claims. They are specific elements and limitations of the claims. They have a specific relationship between those two limitations. And therefore, they can't simply merge them and double count them as a single signal. And with that, your honors, if there are any other questions, please let me know. Because I would love to see questions. Thank you. Mr. O'Connor. Thank you. I simply point out that this was a summary judgment. The court held that there was no issue of fact that the court's    The court's claim construction in the accelerated board was limited to a substrate supporting a microprocessor and a subharmonic signal. The court's claim construction was limited to a substrate supporting a microprocessor with pins that can be inserted into a socket. If you look at Dr. Dent's Exhibit appendix 0349 Dr. Dent 0348 This is Dr. Smith's expert report under oath submitted to the court by Intel as Exhibit K to the motion for summary judgment. He says on 348 the patent requires the following components to a board on which a processor can be mounted which is exactly what the court said. And then if you look at the second page over there this is our expert uncontroverted he says the second element of the 981 patent namely that the processor be mounted on a board is satisfied by the combination of the silicon the silicon is the microprocessor and either plastic or ceramic substrate used to make the processor to the metallic pins that interface to the socket. That is precisely the court's definition and that is our expert under oath in the record uncontroverted testifying that the court's definition is met by the Intel Celeron product. So that is not in dispute and any finding to the court to the contrary was contrary to the uncontroverted record. Are you saying now that the Celeron microprocessor infringes the patent? It infringes in combination with the clock. Intel doesn't make the clock. The clock is made to Intel specifications. It's not the board is one claim limitation in claim one. It's a limitation but other elements have to be there as well. That limitation is the one I just read. That's the microprocessor mounted on the substrate. Is that the only evidence of infringement that's in the record? No, of course not because we have the rest of the evidence in there as well and it's all laid out. The only evidence of infringement that's in the record. Is there any indication that they actually made the combination or anyone made the combination? Only Intel specifications. There's that circumstantial evidence that number one it won't work without that combination. So the only way you can have that combination is if people are buying these papers. That's the only evidence that's in the record? Yes, that's correct. Intel's evidence, not yours? No, it was because there was actual combinations in the clock and the microprocessor? No, that actually was physically done. Our position was it's unnecessary because Intel's information came from our own phased relationship. Mr. Podell argued that we are trying to back away from the definition we agreed to. We didn't back away from the definition at all. Our expert came up with that definition. He didn't say back away from it. He refused to go along with synchronous because synchronous means exact. And that's why our expert insisted that we include the term predetermined not known to an individual but predetermined by the circuit. And what they never addressed because they can't is our experts submitted a declaration of opposition and that declaration is on page 0955. That declaration goes through every single argument that they made in their judgment motion. But what he  that there is a relationship between the sub harmonic signal and the initial input signal that the Intel products couldn't work. And the Intel clock specifications are to a picosecond. It's a trillionth of a second. And I think those are the points I want to address. Any other questions? Thank you